# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOSE ANTONIO RODRIGUEZ,

     Plaintiff

v.

NAPHCARE, et al.,

     Defendants

Case No.: 3:21-cv-00185-ART-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 53

     This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Defendants' motion for summary judgment. (ECF Nos. 53, 53-1 to 53-10.) Plaintiff filed a response. (ECF No. 61.) Defendants filed a reply. (ECF No. 62.) Plaintiff filed a sur-reply (ECF No. 67), which has been stricken by the court (ECF No. 81). The court allowed Defendants to file a supplement to their motion. (ECF Nos. 65, 65-1.) Defendants were also permitted to file a subsequent laboratory test result with the court. (*See* ECF Nos. 84, 85.)

     After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

     Plaintiff is currently an inmate in the custody of the Nevada Department of Corrections (NDOC), however, the events giving rise to this action took place while Plaintiff was a detainee at the Washoe County Detention Facility (WCDF). Plaintiff is proceeding pro se with this action

1  pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 6.) Defendants are NaphCare, Inc., Eloy Ituarte,
2  M.D., Porsche Hill, R.N., and Frank Akpati, N.P.[1]

3       The court screened Plaintiff's complaint, and allowed him to proceed with several claims
4  for alleged inadequate medical care under the Fourteenth Amendment, which is the
5  constitutional standard applicable to inadequate medical care claims brought by pretrial detainees
6  (as opposed to the Eighth Amendment, which applies to medical care claims by convicted
7  inmates). (ECF No. 5.) First, Plaintiff was allowed to proceed with a claim related to the alleged
8  delay in providing him with chemotherapy for his testicular cancer against defendant Dr. Ituarte.
9  Second, Plaintiff was allowed to proceed with a claim related to the alleged removal of an object
10 from his chest against defendant Hill. Third, he was allowed to proceed with a claim related to
11 the alleged delay in providing him with hepatitis C virus (HCV) treatment against defendant
12 Akpati. Finally, he was allowed to proceed with a claim against NaphCare based on NaphCare's
13 alleged policy against curing HCV.[2]

14      Defendants move for summary judgment, arguing that Plaintiff received appropriate care
15 and NaphCare did not have an unconstitutional policy that violated Plaintiff's rights. First, they
16 contend Dr. Ituarte did not cause Plaintiff to miss his chemotherapy treatment, and Plaintiff's
17 oncologist has reported that Plaintiff's cancer is in remission. Second, they contend that taking
18 out a suture from the area where Plaintiff's chest port was removed was within Hill's scope and
19 training as a practical nurse, and there is no evidence bleeding or infection resulted from the
20

21 [1] Akpati was mistakenly named by Plaintiff as Akpaty.

22 [2] Plaintiff's claim that he was denied medical care because his implanted chest port was not
   flushed was dismissed without prejudice; his claim for professional negligence was dismissed
23 without prejudice, but without leave to amend; his claim for denial of the grievance procedures
   was denied with prejudice; and, the Washoe County Sheriff's Department was dismissed with
   prejudice.

2

suture removal. Third, Defendants argue that Plaintiff's HCV was appropriately diagnosed, monitored through laboratory testing, and treated according to NaphCare's policy. They assert that Plaintiff's viral load was consistently below levels concerning for fibrosis[3] or cirrhosis[4], and the denial of medication to cure his HCV was not based on the cost of the medication, but on his minimal viral load. Defendants maintain that NaphCare policy was to provide curative treatment for HCV inmates when clinical criteria and other factors were met.

In their supplemental brief, Defendants provide evidence that NaphCare's Medical Director for the Western States reviewed Plaintiff's laboratory test results from specimens collected on September 12, 2022, and the HCV quantitative ribonucleic acid (RNA) test was negative, indicating Plaintiff no longer has active/chronic HCV.

Plaintiff filed several motions to have an independent laboratory test to confirm whether or not he still has active/chronic HCV. (ECF Nos. 68, 70 and 76.) At a hearing on December 12, 2022, defense counsel confirmed that another laboratory test was performed by Quest Diagnostics before Plaintiff was transferred from the WCDF to NDOC. (ECF No. 84.) Those lab results were filed on December 13, 2022, and confirm that Plaintiff no longer has active/chronic HCV. (ECF No. 85.)[5]

---

[3] Fibrosis is scarring of the liver. *See* Liver Fibrosis - Viral Hepatitis and Liver Disease (va.gov), last visited December 15, 2022.

[4] Cirrhosis "is a late stage of scarring (fibrosis) of the liver caused by many forms of liver diseases and conditions, such as hepatitis and chronic alcoholism." *See* Cirrhosis - Symptoms and causes - Mayo Clinic, last visited December 15, 2022.

[5] Plaintiff also represented at the hearing that a specimen was collected after he was transferred from WCDF to NDOC, and he had requested the results, but had not received them. The court indicated that Plaintiff could make a request to have them filed with the court once available; however, at the time this Report and Recommendation was issued, they had not been filed with the court.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

1   determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

2   *Anderson*, 477 U.S. at 249.

3         In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

4   "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

5   come forward with evidence which would entitle it to a directed verdict if the evidence went

6   uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

7   the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

8   *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

9   omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

10  defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

11  an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

12  party cannot establish an element essential to that party's case on which that party will have the

13  burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

14        If the moving party satisfies its initial burden, the burden shifts to the opposing party to

15  establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

16  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

17  dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

18  be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

19  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

20  (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

21  by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

22  U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

23

1  pleadings and set forth specific facts by producing competent evidence that shows a genuine

2  dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

3  ### III. DISCUSSION

4  **A. Denial of Medical Care to a Detainee under the Fourteenth Amendment**

5        "Individuals in state custody have a constitutional right to adequate medical treatment."

6  *Sandoval v. County of San Diego,* 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*,

7  429 U.S. 97, 104-05 (1976)). "For inmates serving custodial sentences following a criminal

8  conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual

9  punishment." *Id*. "However, pretrial detainees have not yet been convicted of a crime and

10 therefore are not subject to punishment by the state. Accordingly, their rights arise under the

11 Fourteenth Amendment's Due Process Clause." *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 535-36,

12 n. 16).

13       In *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018), the Ninth Circuit

14 concluded that "claims for violations of the right to adequate medical care brought by pretrial

15 detainees against individuals under the Fourteenth Amendment must be evaluated under an

16 objective deliberate indifference standard[.]" 888 F.3d at 1124-25 (internal quotation marks and

17 citation omitted). The elements of such a claim are:

18         (i) the defendant made an intentional decision with respect to the
        conditions under which the plaintiff was confined; (ii) those

19         conditions put the plaintiff at a substantial risk of suffering serious
        harm; (iii) the defendant did not take reasonable available

20         measures to abate that risk, even though a reasonable official in the
        circumstances would have appreciated the high degree of risk

21         involved—making the consequences of the defendant's conduct
        obvious; and (iv) by not taking such measures, the defendant

22         caused the plaintiff's injuries.

23

1    *Id*. With respect to the third element, the conduct must be "objectively unreasonable, a test that

2    will necessarily turn[ ] on the facts and circumstances of each particular case." *Id*. (internal

3    quotation marks and citation omitted).

4         "The mere lack of due care by a state official does not deprive an individual of life,

5    liberty or property under the Fourteenth Amendment." *Id*. at 1125 (internal quotation marks and

6    citations omitted). "Thus, the plaintiff must prove more than negligence but less than subjective

7    intent—something akin to reckless disregard." *Id*. (internal quotation marks and citation

8    omitted).

9         To prevail against NaphCare, which is treated like a municipality and subject to liability

10   under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978),

11   Plaintiff must demonstrate that: (1) NaphCare acted under color of state law, and (2) if a

12   constitutional violation occurred, it was caused by an official policy or custom of NaphCare. *See*

13   *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).

14   **B. Chemotherapy vs Dr. Ituarte**

15       **1. Allegations**

16       Plaintiff alleges that in November of 2018, he was diagnosed with cancer while

17   incarcerated at California's Corcoran State Prison (CCSP), and was treated at Mercy Hospital in

18   Bakersfield, California. His right testicle was removed and a port was placed in his upper right

19   chest for chemotherapy treatment. Plaintiff avers that doctors scheduled him to undergo six

20   sessions of chemotherapy, and his oncologist told him that if he missed a session of

21   chemotherapy, his treatment may not work.

22       Plaintiff asserts that he was scheduled to be transferred to WCDF to await trial in

23   Nevada, and his doctors at CCSP told him he would not be transferred unless doctors at WCDF

1  agreed to continue his chemotherapy treatments, and that WCDF had agreed to do so. Plaintiff

2  was transferred to WCDF on March 7, 2019, and was told at intake that everything was arranged

3  to attend his next chemotherapy session on March 18, 2019, but he did not receive his

4  chemotherapy. Plaintiff filed grievances on this issue, and he was told he was not receiving

5  chemotherapy because NaphCare did not have all the necessary records. However, a letter from

6  CCSP's chief medical officer states that he sent all of Plaintiff's records to Dr. Ituarte at WCDF,

7  and if anything, further was needed to contact CCSP. When Plaintiff eventually saw an

8  oncologist, he claims he was told too much time had passed since his last session.

9      **2. Medical Evidence**

10      On February 14, 2019, Godwin Ugwueze, M.D., Chief Medical Executive of the

11  California Substance Abuse Treatment Facility and State Prison at Corcoran, sent a letter to

12  Dr. Ituarte thanking Dr. Ituarte for contacting him the day before about Plaintiff's transfer from

13  the California Department of Corrections and Rehabilitation (CDCR) to WCDF. He enclosed a

14  discharge summary from Plaintiff's then- provider, Dr. Scharffenberg, as well as his medication

15  administration records and upcoming appointment schedule with the oncologist in Bakersfield,

16  California, from February 25, 2019 through March 1, 2019, for his third course of chemotherapy.

17  Dr. Ugwueze advised Dr. Ituarte to contact him if there was a need for additional information or

18  records to ensure continuity of care for Plaintiff, who was undergoing treatment for testicular

19  cancer. (ECF No. 53-2 at 2.)

20      The enclosed records from Dr. Scharffenberg indicate that Plaintiff was admitted on

21  January 16, 2019, for chemotherapy for testicular cancer, after he had a right orchiectomy

22  (surgical removal of the right testicle) on November 10, 2018. Dr. Scharffenberg noted that

23

Plaintiff had "completed two courses of a 3 course treatment of chemotherapy" with his "next and last course of chemotherapy [] to be started on the 25th of this month [February]." Dr. Scharffenberg commented that Plaintiff may be transferred to Nevada if he is able to continue his chemotherapy in a timely manner, *i.e.*, to start the next course of treatment on February 25, 2019. Dr. Scharffenberg also indicated Plaintiff had a "Port-A-Cath"[6] in place. (ECF No. 53-2 at 3-4.)

Plaintiff arrived at WCDF on March 7, 2019. (ECF No. 53-3 at 22.) The next morning, on March 8, 2019, Dr. Ituarte requested offsite treatment with hematology/oncology for Plaintiff. (*Id*.) On that same date, Charge Nurse Michael Buehler completed an authorization for the release of information for Plaintiff's medical records from both Mercy Hospital in Bakersfield, California and Dr. Scharffenberg, for the provision of health care/continuity of care. The request notes that WCDF was trying to schedule Plaintiff with the oncologist in Reno, who needed the summary from December 1, 2018, forward from the oncologist (in California). (ECF No. 53-2 at 11-14.)

On March 12, 2019, Akpati entered a progress note that Plaintiff was recently transferred from CDCR, had a history of right testicular cancer, had undergone a right orchiectomy, and was undergoing chemotherapy. Plaintiff reported that he was getting chemotherapy every 13 days, and had a Port-A-Cath in place. Akpati indicated he would request approval for Plaintiff to continue his chemotherapy, and would have labs performed. He discussed this with "Kim," and then noted that Plaintiff already had approval for chemotherapy. (ECF No. 53-3 at 22-23; ECF No. 61-1 at 37.)

---

[6] A "Port-A-Cath" is also referred to as a "port," is a surgically implanted device which allows easy access to a patient's veins. *See* What Is A Port-A-Cath? (nurse.org), last visited December 15, 2022.

Records from Dignity Health were scanned into Plaintiff's chart on March 14, 2019, and it was noted that Kim would fax them to support the chemotherapy arrangements. (ECF No. 53-3 at 23; ECF No. 61-1 at 37.)

Plaintiff filed a grievance on March 20, 2019, asserting that WCDF staff failed to provide him with proper medical treatment. A response on March 22, 2019, advised Plaintiff that a request for his records had been sent out, and once the records were received, the provider would review them and move forward. (ECF No. 53-2 at 15.)

Plaintiff saw Charge Nurse Wendy Shine on March 27, 2019, who noted Plaintiff's history of testicular cancer, and stated that Plaintiff was receiving chemotherapy treatment in Bakersfield, and he had three cycles so far out of four to six cycles. She indicated she would send off for records and schedule a follow up with the provider. (ECF No. 53-3 at 24.)

Plaintiff filed another grievance on April 6, 2019, stating that he kept being told that they were waiting for records, but claimed he came with all of his records, and doctors at CDCR sent them prior to his arrival. He stated that his chemotherapy was over a month overdue. Hill responded that his records had been reviewed and his plan of care was scheduled. (ECF No. 61-1 at 49.)

Plaintiff saw oncologist/hematologist, Juan Cattoni, M.D., on April 30, 2019. (*See* ECF No. 61-1 at 50; ECF No. 53-2 at 21.) Dr. Cattoni noted that Plaintiff came to him two months after getting his last chemotherapy. It was decided not to continue with the fourth cycle of chemotherapy "given he was too late." Plaintiff had follow-up tumor markers that were within normal limits. (*Id.*) In later notes, Dr. Cattoni said that Plaintiff had received three cycles of chemotherapy, with the last treatment given from February 26 through March 1, 2019, and

1  "unfortunately he moved to Reno and did not finish his last cycle of treatment." (ECF No. 53-2
2  at 23, 27.)

3      Akpati reviewed Plaintiff's chart on May 2, 2019, and noted Plaintiff had recently been
4  seen by Cancer Care Specialists (Dr. Cattoni's office), who requested labs and imaging, which
5  were ordered. (ECF No. 53-3 at 25.)

6      A CT scan of the chest on May 15, 2019, showed a 2 mm subpleural nodule in the
7  posterior left upper lobe, that had been stable since December 17, 2018, and may represent
8  fibrosis. (ECF No. 61-1 at 109.)

9      Plaintiff saw Dr. Cattoni on June 4, 2019. On June 5, 2019, Akpati requested approval for
10 Dr. Cattoni's offsite follow up recommendations, including a PET scan and follow up with a
11 general surgeon. He indicated that the concern was a new 2cm retroperitoneal pancreatic lymph
12 node seen on the CT scan. (ECF No. 53-3 at 25-26.)

13     Plaintiff was sent out for a PET scan on June 14, 2019. (ECF No. 53-3 at 26.) That CT
14 scan showed resolution of the activity associated with the retroperitoneal lymph nodes seen on
15 the prior scan. (ECF No. 53-2 at 21.)

16     Plaintiff saw Christos A. Galanopoulos, M.D., a general surgeon, on June 18, 2019,
17 regarding the adenopathy in the retroperitoneum (detected on the prior scan), but Dr.
18 Galanopoulos noted that his most recent PET scan was negative for uptake and the enlarged
19 nodes had disappeared, and there was no sign of recurrent disease in the liver or abdomen. (ECF
20 No. 53-2 at 16.) Akpati confirmed this, and noted surveillance was the plan going forward. (ECF
21 No. 53-3 at 26.)

22     Plaintiff saw Dr. Cattoni on July 3, 2019, for a follow up visit, and he likewise noted
23 resolution of the peripancreatic lymphadenopathy. He also commented that Plaintiff's most

11

recent tumor markers were within normal limits, and he did not have signs of disease

progression. (ECF No. 53-2 at 21.) The plan was continued follow-up with monitoring and scans.

(*Id*. at 23.)

Plaintiff saw Dr. Cattoni again on September 3, 2019. Plaintiff felt great and was in his

regular state of health with no complaints. There was no clinical sign of disease recurrence, and

he was instructed to follow up in three months. (ECF No. 53-2 at 25, 27.)

Plaintiff saw Dr. Cattoni on December 16, 2019. His physical exam was unremarkable,

and surveillance was to be continued. (ECF No. 53-2 at 29-32.)

On January 14, 2020, Dr. Colby Laughlin reviewed CT scans of the chest, abdomen and

pelvis, and a bone scan. His impression of the chest scan was a stable 2mm left upper lobe

nodule. (ECF No. 53-2 at 33.) The abdominal and pelvic scan revealed a stable, mildly enlarged

peripancreatic lymph node. (ECF No. 53-2 at 35.) The bone scan was unremarkable. (ECF No.

53-2 at 36.)

Plaintiff saw Dr. Cattoni again on February 26, 2020. Dr. Cattoni indicated there was no

clinical or radiographic evidence of testicular cancer, and Plaintiff was instructed to follow up in

six months. Dr. Cattoni advised it was okay to remove the chest port. (ECF No. 53-2 at 37-38.)

On June 22, 2020, Plaintiff filed a medical grievance, stating that they denied his

chemotherapy that he was undergoing prior to his transfer to Nevada. (ECF No. 61-1 at 48.)

**3. Analysis**

There is some confusion in the record about how many courses of chemotherapy Plaintiff

was supposed to undergo. Dr. Scharffenberg, Plaintiff's oncologist from California, indicated

Plaintiff had completed two courses of a three-course treatment, and his "next and last" course

was to be started on February 25th. This was completed before Plaintiff transferred to WCDF.

Dr. Cattoni, who presumably had the benefit of reviewing all of Plaintiff's oncology records, said that Plaintiff was supposed to undergo a fourth round of chemotherapy, but it was too late for this when he saw Plaintiff on April 30, 2019.

Dr. Ituarte, for his part, immediately put in the referral for Plaintiff to see an oncologist upon Plaintiff's transfer to Nevada. There was apparently a delay in getting Plaintiff's records. While Plaintiff asserts that he came to WCDF with his records, he provides no evidence of this. Dr. Ugwueze's letter only states that he enclosed the discharge summary from Dr. Scharffenberg, his medication administration records, and upcoming appointment schedule with oncology in Bakersfield. While there may have been a delay in Plaintiff seeing the oncologist after his arrival to WCDF, there is no evidence that the delay is attributable to Dr. Ituarte. In other words, there is no evidence that Dr. Ituarte made an intentional decision with respect to Plaintiff's treatment that put Plaintiff at substantial risk of serious harm. Even if the failure to ensure his records were timely provided so he could get into the oncologist sooner could be described as a "lack of due care," "[t]he mere lack of due care" does not violate the Fourteenth Amendment. *Gordon,* 888 F.3d at 1125 (citations and quotations omitted). Negligence is insufficient, and there is no evidence that Dr. Ituarte acted with reckless disregard to a substantial risk of serious harm.

Importantly, courts have held that a delay in providing medical care alone is insufficient. Instead, to violate the constitution, the plaintiff must demonstrate the delay led to further injury. *See Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022) (citing *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).

Here, the record reflects that Plaintiff's cancer was in remission, and there were no signs of progression of the disease. Thus, there is no evidence that any delay of an additional round of chemotherapy resulted in any further injury to Plaintiff.

Therefore, Defendants' motion for summary judgment should be granted as to Dr. Ituarte.

**C. Removal of Object vs Hill**

**1. Allegations**

Plaintiff's chest port was ultimately surgically removed at his request. Plaintiff claims that as the wound from removing the port was healing, he noticed a piece of plastic poking out, and the wound felt hot and hurt. He alleges that defendant Nurse Hill was not properly educated or trained to diagnose the issue or remove the object, but she watched videos on YouTube and told Plaintiff she would yank the object out of Plaintiff's chest. She did so, without numbing the area first. Plaintiff felt extreme pain and blood poured out of the wound, though it closed after several rounds of gauze and tape. Plaintiff wrote to medical in June of 2020, claiming that he could still feel something sticking out of his chest, and that his wound hurt badly and was infected. Plaintiff saw the surgeon who had removed the port and explained what Hill had done. Plaintiff claims the surgeon told him that Hill should not have performed the removal procedure because she could have damaged Plaintiff's vein. It appeared to the surgeon that what Hill had done was remove stitches that remained after the port-removal surgery. Stitches that, according to the surgeon, would have dissolved on their own.

**2. Medical Evidence**

Plaintiff saw his oncologist, Dr. Cattoni, on February 26, 2020. There was no clinical or radiographic evidence of testicular cancer, and Plaintiff was instructed to follow up in six

1    months. At that time, Dr. Cattoni advised it was okay to remove the port. (ECF No. 53-2 at 37-

2    38.)

3        On March 5, 2020, Nurse Lisa Russell completed Plaintiff's annual physical examination

4    and noted Plaintiff had completed chemotherapy and was waiting for his port in his chest to be

5    removed. (ECF No. 53-4 at 17-22.)

6        On May 27, 2020, Dr. Matthew Crapko, a general surgeon, removed the port from

7    Plaintiff's chest because it was no longer in use, and Plaintiff desired to have it removed.

8    Dr. Crapko's instructions state: remove outer dressing tomorrow, may shower after, and Steri-

9    Strips[7] will fall off on their own. Plaintiff could take over-the-counter Tylenol and ibuprofen for

10   pain. He was instructed to call or return if symptoms worsen or persist. (ECF No. 61-1 at 119-

11   120; ECF No. 43-3 at 5.)

12       On  June 17, 2020, Akpati saw Plaintiff for chronic care and noted there was a piece of

13   suture in Plaintiff's right upper chest where the port had been removed, and it looked like a stitch

14   had been left in place. The plan was to remove the single stitch on the right upper chest. (ECF

15   No. 53-4 at 24, 29.)

16       Plaintiff sent a medical grievance on June 22, 2020, noting that after his port was

17   removed there was a "piece of plastic" left in the wound. He told the nurse he was in pain and

18   showed her the plastic and she said, "stop being a baby" and that the plastic was a stitch (which

19   Plaintiff disputed). Medical then said they were preparing to remove the plastic in his chest

20   themselves by watching YouTube videos, which Plaintiff claimed was unprofessional. He

21   asserted that he was in pain and pulling on the plastic in his chest would only cause more pain.

22

23   [7] Steri-Strips are "thin adhesive bandages often used by surgeons as a backup to dissolvable
     stitches or after regular stitches are removed." *See* Steri Strips: How to Apply, Care For, Remove
     (healthline.com), last visited December 15, 2022.

He also reported that he was told he would not get any pain or anesthetic to numb the area before the plastic is pulled out. (ECF No. 61-1 at 48, 132.)

On June 23, 2020, Hill noted that Plaintiff had his port removed on May 27, 2020, and he was complaining of an anchor stitch still in place in the left outer-corner of the scar from his port removal. Hill indicated that the anchor stitch was removed without complication. A Band-Aid was put in place, and Plaintiff was told to leave it in place until the following morning. She noted a small puncture wound where the stitch was in place, but there was no bleeding or discharge from the puncture mark. (ECF No. 53-3 at 27.) In response to his earlier grievance, Plaintiff was instructed to notify medical of any immediate health concerns. (ECF No. 61-1 at 48, 132.)

On June 24, 2020, Plaintiff was brought in to verify *another* anchor stitch that needed removal. Plaintiff did not complain of pain on palpitation. (ECF No. 53-3 at 27.)

On June 30, 2020, Plaintiff sent an inquiry advising he still had anchor stitches in his chest where his port had been removed, which were hurting and felt infected. He noted that one had been removed already. He was advised he had a medical appointment pending. (ECF No. 53-3 at 1.)

On July 9, 2020, Hill brought Plaintiff it to attempt to remove a possible anchor stitch embedded in the right inner corner of the scar from his port removal. She was able to feel a possible tip of the anchor stitch, but she was unable to remove it due to scar keloid[8] over the stitch. (ECF No. 53-3 at 27.) Less than 30 minutes later, Plaintiff saw Akpati, who said that residual stitches appeared to be embedded within the post-procedure scar. He noted there were no post-operative instructions to remove the sutures, and an incision would have to be made to

---

[8] A keloid scar "is a thick raised scar." *See* Keloid scar - Symptoms and causes - Mayo Clinic, last visited December 15, 2022.

remove these, which could not be done onsite, and he requested a follow up with Dr. Crapko (the surgeon who removed the port). (ECF No. 53-3 at 28.)

On July 15, 2020, Plaintiff saw Dr. Crapko regarding a possible stitch at his port site. Dr. Crapko said that apparently one of the sutures worked its way out to the skin and was removed by the prison hospital system. On examination, he noted that Plaintiff's skin incision in the chest wall was well healed, and there were no protruding sutures at that time. There was no evidence of infection. Dr. Crapko indicated that the sutures placed at the port removal site were dissolvable, and should dissolve without further removal. (ECF No. 53-3 at 2, 4.)

**3. Analysis**

Defendants provide the report of their expert witness, Alfred Joshua, M.D., who states that suture removal is within the scope and training of a licensed practical nurse. In addition, Defendants contend there is no evidence there was any bleeding or infection that resulted from the suture removal. They further point out that Plaintiff subsequently asked to have another suture removed, which undermines Plaintiff's claim he was somehow harmed by Hill's removal of the suture. Dr. Crapko noted on July 15, 2020, that the area was healing well and there was no evidence of infection.

Plaintiff argues that Dr. Crapko's discharge instructions (from the port removal surgery) did not state to remove any anchor stitches, and Dr. Crapko stated that the stitches would dissolve on their own. He claims that Hill nevertheless decided to remove the stitch, causing Plaintiff an extreme amount of pain and did not make an incision, and did not give him any pain medication, anesthesia or numbing solution.

While there were no instructions in Dr. Crapko's discharge summary to remove any stitches, in his subsequent appointment with Dr. Crapko, it was acknowledged that a stitch

apparently worked its way out to the skin and was removed (by Hill). The doctor did not note that there was any problem with Hill having removed the stitch that had migrated to the surface. Dr. Crapko commented that he could not see any other stitches protruding at that point, and any remaining stitches (under the surface of the scar) should dissolve on their own.

The court cannot conclude that Hill's decision to remove a stitch that had worked its way out to the skin was objectively unreasonable under the circumstances. There is no evidence that her conduct put Plaintiff at a "substantial risk of suffering *serious* harm." Therefore, summary judgment should be granted in Hill's favor.

**D. HCV Treatment vs Akpati and NaphCare**

**1. Allegations**

Plaintiff alleges that he was diagnosed with HCV in May 2019, and while he filed numerous grievances seeking medication to cure his condition, he was told he was on the list or scheduled to see the provider. When he saw Akpati, he was told to be patient. After a year with no treatment, nurses allegedly told him a cure was not coming because it was too expensive, and NaphCare had a policy to not provide treatment.

**2. Medical Evidence**

There is a notation on March 22, 2019, that Plaintiff reviewed Plaintiff's lab results and noted elevated liver enzymes, and planned to test Plaintiff for hepatitis. (ECF No. 53-3 at 23.) The laboratory results were positive for HCV. (ECF No. 53-5 at 15.)

On April 10, 2019, Plaintiff saw Nurse Russell at his cell door and asked for information about his HCV diagnosis. He was advised that he would be seen by the provider for chronic care. (ECF No. 53-3 at 24.)

Plaintiff had a chronic care visit on May 11, 2019. (ECF No. 43-3 at 25.) On June 2, 2019, Chris Martin, a health services administrator, noted that Plaintiff was seen for his chronic care visit, and his disease control was good. (ECF No. 53-4 at 16.)

Defendants represent Plaintiff's laboratory results from July 10, 2019, indicate an APRI[9] score of .421. Laboratory results from August 20, 2019, indicate an APRI score of .392. (ECF No. 53-5 at 19.) August 27, 2019 laboratory results indicate an APRI score of .296. (ECF No. 53-5 at 20-23.)

Plaintiff sent a medical grievance on November 24, 2019, stating that he was diagnosed with HCV, but nothing had been done. On November 25 and 27, 2019, Hill advised him that he was seen in May, and he had a chronic care appointment scheduled to follow up. (ECF No. 61-1 at 111-112.)

Plaintiff's laboratory results from December 31, 2019, indicated an APRI score of .273. (ECF No. 53-5 at 24-26.)

Plaintiff sent another grievance on June 7, 2020, again complaining that he was told on May 20, 2019, that he has HCV, but nothing had been done. He reported that he asked a nurse for treatment, and she said she would look into it. When Plaintiff asked again, he was told there was a cure, but NaphCare does not provide it because it is too expensive. Plaintiff was advised he was scheduled to see a provider soon where he could discuss his concerns. (ECF No. 61-1 at 113.) Plaintiff was subsequently told he was scheduled for a follow up chronic care appointment. (*Id*. at 114.) He continued to grieve this issue and the lack of treatment for HCV. (*Id*. at 115.)

---

[9] APRI stands for aspartate aminotransferase to platelet ratio index, and "is a way to measure fibrosis of the liver for those with [HCV]." Generally, if the APRI score is less than 0.5, it is a strong indicator there is little to no fibrosis. *See* APRI Score: Alternative Fibrosis Test for Hepatitis C (healthline.com), last visited December 15, 2022; What Is the APRI Score? (webmd.com), last visited December 15, 2022.

1    Ludlow (not a defendant) responded on June 21, 2020: "per policy treatment for hep C is not

2    started while incarcerated." (*Id.*)

3        Plaintiff saw Akpati for a chronic care visit on June 17, 2020. He noted Plaintiff's HCV

4    diagnosis in 2019, and described Plaintiff as stable, but he ordered new labs to calculate his

5    APRI score. (ECF No. 53-4 at 23-24, 29.) Lab results from June 18, 2020, revealed an APRI

6    score of .366. (ECF No. 53-5 at 27-31.)

7        Plaintiff sent a medical grievance on June 22, 2020, stating that he was diagnosed with

8    HCV in March of 2019, and when he asked when he would receive treatment he was told the

9    treatment would not be provided because it is too expensive, and he could take care of it when he

10   went home. (ECF No. 61-1 at 48.)

11       On December 17, 2020, Akpati saw Plaintiff for chronic care and indicated there was no

12   evidence of progression of HCV. Plaintiff's APRI score was .357. (ECF No. 53-4 at 30-31, ECF

13   No. 53-5 at 29-31.)

14       On January 28, 2021, Akpati stated that Plaintiff's labs were stable, and his APRI was .3,

15   he was not jaundiced, and his level of disease control was good. (ECF No. 53-5 at 3, 6.) Akpati

16   noted that Plaintiff complained he was not getting care for HCV, and Akpati gave Plaintiff the

17   following explanations: (1) HCV is not acute or emergent, and requires 8-12 weeks for treatment

18   and the length of a stay in jail is not determined by a medical condition, but by legal

19   circumstances (indicating there may not be time to administer the course of treatment while the

20   inmate is in jail); (2) treatment is very expensive, which makes it prohibitive, and the jail did not

21   have grants to cover the cost of treatment at that time; and (3) on release, Plaintiff could seek

22   treatment with community organizations. (*Id.* at 8.)

23

Plaintiff's laboratory test results from specimens collected on September 12, 2022, reveal that the HCV quantitative RNA test was negative, indicating Plaintiff does not have active/chronic HCV. (ECF No. 65-1 at 20.)

Laboratory results from Quest Diagnostics from a specimen collected on November 9, 2022, also state that the HCV RNA was not detected, indicating again that Plaintiff no longer has active/chronic HCV. (ECF No. 85 at 6.)

**3. Analysis**

In response to his inquiries, the record does not reflect Plaintiff was told that he was not given treatment for HCV because he did not meet the clinical criteria. Instead, the record indicates that he was advised that treatment for HCV is not started while an inmate is incarcerated; HCV is not acute or emergent; treatment is very expensive, which makes it prohibitive; and, he could seek treatment upon his release.

Despite these varying explanations for why Plaintiff was not receiving treatment, Plaintiff's condition was monitored regularly. The FIB-4 score is used to estimate the amount of scarring in the liver to determine the risk of liver fibrosis and additional treatment. Plaintiff's FIB-4 scores showed he was at low risk of liver fibrosis. As noted above, the APRI score is a way to measure fibrosis of the liver. Plaintiff's APRI scores also indicated he was at low risk of liver fibrosis. Plaintiff did not have any additional risk factors such as HIV, advanced age, etc., to warrant an increased risk of progression of the disease, and there is no link between having testicular cancer and increased risk of cirrhosis with having HCV. (*See* Dr. Joshua's report, ECF Nos. 53-6 at 9, 53-7 at 3-4.)

It likely would have gone a long way, and may have obviated the need for this claim, if NaphCare staff had explained any of this to Plaintiff. Importantly, however, similar to his

chemotherapy claim, there is no evidence that any delay in providing him with HCV treatment resulted in further injury. In fact, the most recent evidence demonstrates that Plaintiff no longer has active/chronic HCV.[10] Nor is there evidence of cirrhosis or other medical conditions or complications caused by the delay in providing HCV treatment.

Therefore, summary judgment should be granted in favor of Akpati and NaphCare.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (ECF No. 53).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: December 16, 2022

_____
Craig S. Denney
United States Magistrate Judge

---

[10] According to Defendants' expert, 20 to 25 percent of individuals will clear the infection on their own. (ECF No. 53-7 at 3.)